Case number 24-1381 from the District of Eastern Arkansas, James Johnson v. United States Postal Service Mr. Poynter, when you're prepared, please proceed May it please the Court, I am William Poynter representing the appellate James Johnson against the United States Postal Service for dismissal of his claim on summary judgment, employment discrimination, and a hostile work environment created by the Postal Service at the branch where he worked Mr. Johnson was a 36-year employee of the Postal Service. It wasn't until 2018, which was year 34 of his service, that he began experiencing these events which were hostile in nature, were pervasive, and which continued until his early retirement in June of 2020 The District Court, in dismissing the hostile work claim, claimed that the actions of the Postal Service, which were admittedly startling and different from any other employee there, that those actions amounted to increased scrutiny and that that's allowed under the O'Brien case I believe the District Court made a comment about increased scrutiny does not necessarily equal a hostile work environment. Well, that's true, but it could, and that is in fact the finder of facts job Does that need to be tied to one of the stated purposes of the underlying law, like race or gender? And if so, what's the nexus here? Yes, sir, it does, and typically what they're looking at once someone is identified as a member of a protected class and there are adverse employment actions taken against them, that nexus is established generally by looking at the, again, severity of the acts complained of, the frequency of it, and the pervasiveness of it What are the facts here that indicate he's being discriminated against on the basis of a protected category? Thank you for asking. The facts can broadly be broken down into, I think, three categories, the first of which is Mr. Johnson was subject to constant evaluation and oversight by his manager. Again, this is 34 years into his employment. He starts having daily evaluations by the manager who is consistently watching him You've said that, but what is the connection between that conduct and a protected status of the plaintiff? Well, the plaintiff's protected status, which we all agree with, that he is a protected class member, the difference is that there is no other non-protected class member, whether they be white, female, or younger, who was subjected to anywhere near the number of evaluations to the failure criteria of the evaluations that Mr. Johnson was, and ultimately to the disciplinary actions that he got for failing Was he truly, this is the other side's point, was he truly the only retail clerk? No, your honor, I do not believe that he was. Well, what does the record show at this point? This is summary judgment. Was he or was he not the only retail clerk? He was a retail clerk, not the only retail clerk. Was he only full-time retail clerk? I don't remember how they phrase it. Right, so according to the United States, the duties of Mr. Johnson would always have him at the front desk, and he's the only one there. In fact, the facts, as cited in brief, state that a number of other employees would come up and serve time at that second window, which was also always staffed, and that Mr. Johnson had frequent duties away from the window, which was not addressed in the district court's order, and to me seems very on point for why that decision was made. A lot of it was based on him being the only person that was there all day and that was performing these customer-facing duties. In fact, Johnson testified and his employer agreed that he did have duties away from the desk, and that nobody knew how much time he spent away from the desk versus these other rotating employees, how much time they spent away from the desk. Nobody knew because no records were kept of that, but everybody acknowledged and Mr. Poynter, who was his manager, agreed that yes, he has some duties away from the desk, and yes, the rotating employees who are there also have some duties away from the desk. Ultimately, moving on a little bit from the hostile to the disparate or discriminating behavior, district court points to a lack of a sufficient comparator in order to conclude that there is discrimination. There are nine people identified, and those are in fact the nine other employees of that branch, as potentially being comparators. The district court concludes that none of those are similarly situated to Mr. Johnson in order to make this conclusion. I would argue, first of all, that factually that's not correct because of what we just talked about, the difference in Johnson's duties versus those rotating employees and how they are all doing some mix of everything. I would also say that even if that were true, that Johnson is there all day at the desk and that no other employee is there all day at the desk, the comparator is whoever, whatever combination of people are at that other desk throughout the day because what we're really comparing is Johnson there during the day, receiving multiple evaluations, three, four other people at the second desk during the day receiving no evaluations, over and over and over. He had 236 evaluations, the next closest was 16. Are those evaluations standing alone a sufficient adverse action? Because here's what happened. Judge Marshall said there was no adverse action because the uniform violation and the AWOL suspension letter were both withdrawn. And so all you really have is that the postal service said Mr. Johnson was a crummy employee and he just took a lot of work for us to try and work into shape, and then he retired, took early retirement and walked out the door. So there is no adverse action. Why is Judge Marshall wrong on that factual finding? Because I think that the adverse action, ultimately that conclusion is a legal conclusion. But the conclusion that nothing happened and your client just decided to retire because he didn't like the supervision, is that an adequate adverse action? Thank you, Your Honor. Your Honor, I do believe it is an adequate adverse action because it's not just the number of the evaluations that he's subjected to. It is, again, the failing criteria which he is subjected to and which no other employee is subjected to. They testify, or Mr. Porter, who is the supervisor, testifies that it's at his discretion to decide if failing to ask a series of questions to a shopper is going to result in a failure of that evaluation or not. For some employees, it doesn't. The exact same question asked does not result in any sort of failure for at least four of the other employees, whereas that series of questions for Mr. Johnson did result in a failure. But that was one that was rescinded, right? The mystery shopper was rescinded? They were all rescinded, yes, sir. Okay, so is it not an adverse action? Well, at some point, the fact that he continues to be hit with these letters of warning and suspensions, they were all rescinded. Each time it was agreed, hey, we won't do this again because we're not going to discipline based on these pieces of evidence. He had three rescinded, right? Yes, you're right, Your Honor. He had three rescinded. Please proceed. After those three rescinded things are not considered, were there other complaints from members of the public? And forgive me because I may be confusing this with another case later in the week, but I seem to recall that there were members of the public that complained about Mr. Johnson and there were no such similar complaints about the other people that filled in for him. So as far as the record shows, there was one customer, an individual named Jack Oliver, who allegedly complained about Mr. Johnson's break time, that he was gone from the window too long. Mr. Oliver did not testify in the case. He would have had we gone to trial, but Mr. Poynter, the supervisor, ultimately told Johnson that what he had said about Mr. Oliver, I'm sorry, let me take that back. Mr. Oliver told Mr. Johnson, I never made that complaint. I've never said anything like that about you, Mr. Poynter. He was a neighbor, right? Right. Yes, sir, he was. He was there locally and the idea was that I guess he would sit there and time the employee's breaks, but only Mr. Johnson's. In fact, that turned out to not be true either. I don't know why his supervisor started that, other than to say this guy was subject to a lot of harassing and really inappropriate things over his last two years. Counsel, did you raise the retaliation claim below? Your Honor, so the retaliation claim, according to the government, was not raised at the EEOC level, and so administrative remedies weren't exhausted. But, in fact, there was an amendment to the EEOC complaint, I believe it was May of 2020, that included a retaliation claim. The EEOC did not address it in their findings, but ultimately it was picked up and put into the complaint in this case. At least as we've argued, the retaliation claims, they are not bad. Did Judge Marshall make a ruling on retaliation? Judge Marshall did not address retaliation. I don't know why that is. I mean, he did not address it from a procedural standpoint, certainly, or a factual standpoint, but that was something that was part of the claim, and is essentially those same hostile acts, only now in retribution for actually making a complaint about it. I know I'm out of time. I would reserve any time you'd be willing to give for rebuttal, and I appreciate it. Thank you, Mr. Porter. Ms. Dempsey. May it please the Court, Counsel. My name is Jamie Dempsey, and I represent the appellee, the Postal Service. There's no evidence in the record that Mr. Johnson was treated differently based on his race, age, or gender, so the District Court properly granted summary judgment on his hostile work environment and discrimination claims. The District Court also did not address any retaliation claim, because Mr. Johnson did not allege retaliation in his complaint, and he did not raise it administratively, so he has not exhausted his administrative remedies for a retaliation claim, and he should not be allowed to raise it for the first time on appeal. To the extent Mr. Johnson was treated differently than his coworkers, that was not due to his age, race, or gender. It was primarily due to his unique role in the office as the only full-time employee who consistently worked as a window clerk, between April 2018 and October 2020. While this may amount to what he perceived as increased scrutiny or a frustrating work environment, it does not establish a hostile work environment or provide evidence of disparate treatment based on race, age, or gender. What greater percentage did he work at the front desk versus those others who may have spent some time there? My understanding, and I'm familiar with this post office oddly enough personally, there are two windows at the front of the post office. He was always assigned to one window. If it was slow, he could be doing duties, like if there was no one in the lobby, he might be attending to things not at the window. But generally speaking, for his eight-hour shifts, he was assigned to the one window. Other employees, whether they be full-time employees, part-time employees, postal support employees, would fill in at that second window as needed by the business in that postal station that day. Does that address what you're looking for? I'm just trying to get a feel for what would explain the dramatic difference in numbers.  In the record, Marvin Pointer testified quite a bit about the policy in the area, a policy that was verbally communicated to him that employee evaluations needed to happen daily. If you were working an eight-hour shift where you worked most of the day at that window, as compared to other people filling in, and there were daily evaluations being done, you could see that evaluation could happen quickly. So I guess to further explain the evaluation. Where I was going was in an eight-hour day, the plaintiff is going to be there all day at the same window. Correct. You said there would be others who would be at the other windows from time to time. I'm trying to get a sense of, okay, if he's getting eight hours at the window, the others, how many hours are they getting at that window? It's simply not clear from the record. Because what Mr. Pointer explained was we try to keep a second window open. It is not always that a second window is fully staffed. It really depends on the circumstances of each day. Your Honor, while the record does reflect that he was evaluated 263 times, that means that a supervisor or manager is coming in just to see, is he doing this perfect transaction? These happen to other employees too. And of the 263 times, he was only disciplined based on four. And so these evaluations. What happens with an evaluation? Is that something that you get notice of and that we found you deficient on this day at this time? If a failure is found, yes. So for all of those 259 times when he was not deficient, that supports the fact that he was known as a good employee there. Would he even be notified of those evaluations if they weren't deficient? If he had a lot of good ones, I think at one point he was maybe like a gold star employee. That would support him being a good employee. Does that make sense? You do have to sign off if you fail. So you wouldn't necessarily sign off if you passed on each time. I guess what I'm getting at is would somebody be bugging you all the time because of these evaluations? No. So Form 4000B is supposed to be filled out on a daily basis according to this policy for every employee who works the window, even on a rotating basis, right? So somewhere out there in the world, in the postal service, there is a stack of thousands and thousands and thousands of 4000B evaluations that say everything's okay? Or was Form 4000B only filled out when people had problems on a daily basis? Something somebody said during the day? It's filled out to comply with that. Every day? Yes. For every employee? That is the goal. And there were times when they weren't getting it done and the supervisors felt pressure to do it more often. And it's a checklist of what do they expect in a perfect transaction that's communicated down from the postal service because they want to improve their customer service. So this is all about providing good customer service and not about Mr. Johnson's race, age, or gender. That's governmentian, man. Nobody has a daily evaluation. It's not evidence of discrimination, though. True. Unless you're not doing it to everybody, it can't be. Yeah. Well, not in this case, Your Honor. And that's because the record is simply devoid of any other link to that protected characteristic. And further, I mean, so that's the issue here with why there is no hostile work environment. And that's what this court held in O'Brien. It's what this court held in Bradley. And it's also what this court held in Rickard. There was a little bit of attachment to his age and his gender, but this court also found that there was not hostile work. What was the breakdown of the coworkers in terms of their fitting the categories for discrimination? So the other full-time employees, there was one black male who was younger. There were five black females who were, I don't know if they were younger or not. And then there were two white females. And within that breakdown, it's interesting, the black male was never evaluated. Of the black females, one was evaluated 16 times. Was that because he never worked at the window? They never managed to evaluate him if he did work at the window. And the other thing about these employees. Isn't that curious? I mean, if this one guy is getting evaluated and these other people come and work at the window. It's curious, but I think that the other thing that's misleading is this period of time from April 2018 to October 2020, some of these employees were there during the time when more evaluations were happening. So the only other African-American male never got evaluated? Correct. And two of the black African-American females were never evaluated. And so some of that goes to during this time of two and a half years or whatever, April 2018 to October 2020, he worked there all the time, that whole period. Some of these people worked at this station during that time and then maybe worked at a different station. And so they weren't necessarily there for that whole time frame either. So it's, I mean, we just don't have a perfect situation to really compare. There's not really a sufficient comparator. There's no one who is similarly situated to him. And that's the problem with the discrimination claim. As Judge Marshall correctly held, he had four failures. No other full-time employee had that many failures. The evaluations themselves are not adverse actions. And truthfully, all of the discipline he received was rescinded. And therefore, that really doesn't establish an adverse employment action either. And you can rely on the Singletary case for that in that when he was placed on administrative leave, once he was reinstated and back to his pay and benefits, there was no adverse action. Similarly, in Jackson v. United Parcel Service, which I didn't cite in my brief, that's 548 F. 3rd 1137, the plaintiff, there had been an initial decision disqualifying her from a promotion. Once that was reversed after she filed a grievance, then there was not an adverse employment action on the part of the defendant in that case. So similarly here, once the Postal Service, once he filed the grievances about the discipline and they rescinded that discipline, those don't really serve as adverse employment actions. Now, Judge Marshall assumed the adverse employment action in that Mr. Johnson met his prima facie case. The Postal Service had the legitimate business reason of implementing its policies to evaluate the employee's performance and have them follow the dress code and submit medical documentation for their sick leave. And so then it moved to show pretext and he simply can't show pretext because there's not a sufficiently similar comparator. So for all of these reasons, the Postal Service respectfully requests that this court affirm Judge Marshall's decision in the District Court. Thank you, Your Honors. Thank you, Ms. Dempsey. Mr. Forner, we used up all your time, but we'll give you a minute if you heard something that you feel compelled to reply to. Thank you, Your Honor. Just one thing I would state, which is in Harris v. Forklift System, which is a U.S. Supreme Court case, 510 U.S. 17, the court looked at the types of factual situations that would constitute a hostile work environment. And while they were usually focusing on physical or tangible psychological harm, to me the real key in that case was, again, the severity, the frequency, and the pervasity of the job. There's a comment about, you know, this can't necessarily just be, you know, it has to be beyond the ordinary workplace tribulations, I believe is the word they used. It has to be beyond just the daily, you know, headaches we have at work. It has to be something else. Every day he was subjected to something that no one else was subjected to in a broad number of categories. And so we would ask that the finder of fact be allowed to hear those and render a decision. Thank you. Thank you, Mr. Porter. Thank you also, Ms. Dempsey. The court appreciates both counsel's participation and argument before the court. We will continue to study the matter and render a decision.